UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
NATHANIEL NEWSON,

                Plaintiff,                        MEMORANDUM AND ORDER
                                               16-CV-6773 (ILG) (JO)

    v.


THE CITY OF NEW YORK,

                Defendant.
----------------------------------------------------------x
GLASSER, Senior United States District Judge:

      Plaintiff Nathaniel Newson (**"Plaintiff"**) brought this action pursuant to 42 U.S.C. § 1983 and state law against Defendant, the City of New York (the **"City"**), based on the alleged misconduct of the New York City Police Department (**"NYPD"**) and the Queens County District Attorney's Office (**"QCDA"**). The legal theories underlying Plaintiff's § 1983 claims are difficult to parse; however, their basic thrust is that the NYPD and QCDA unconstitutionally withheld material exculpatory evidence from him. His state law causes of action sound in false arrest, malicious prosecution, and negligent training and supervision. The City moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the motion is granted in part and denied in part. Plaintiff's request that he be permitted to amend the complaint pursuant to Rule 15(a) is granted in part.

## STANDARD OF REVIEW

      In reviewing a motion to dismiss, the district court must accept the well-pleaded factual allegations in the complaint as true and draw all inferences in the plaintiff's favor. *See Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018). Although materials extrinsic to the complaint may not generally be considered, *see* Fed. R. Civ. P. 12(d),

the court may "take judicial notice" of "public records," such as prior judicial proceedings, "to establish their existence and legal effect." *Fine v. ESPN, Inc.*, 11 F.Supp.3d 209, 223 (N.D.N.Y. 2014) (citations and quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

## BACKGROUND

The following facts derive from the amended complaint (Am. Compl., ECF No. 12).

On August 5, 2010, Damian Champell (**"Champell"**) was shot multiple times while sitting in a black 2004 BMW in Queens, New York. (Am. Compl. ¶ 11). He initially survived the shooting, but after being transported to Jamaica Hospital he was pronounced dead. (*Id.* ¶ 12). The NYPD recovered eight 9 mm shell casings from the murder scene: five from the street and three from inside the vehicle. (*Id.* ¶¶ 20-21).

Plaintiff was not present at the scene of the murder when it occurred, but went there when he heard gunshots. (*Id.* ¶¶ 13-14). Plaintiff avers that he "was a registered Confidential Informant" and "walked to the scene because he was acting in his capacity as a CI." (*Id.* ¶¶ 15-16). After arriving at the scene, he was placed under arrest and charged with second-degree murder and unlawful possession of a weapon. (*Id.* ¶¶ 17-18). He had no weapon on him when he was arrested. (*Id.* ¶ 19). The amended complaint provides no detail as to what interaction Plaintiff had with the officers prior to his arrest or whether he was told why he was being arrested. He was indicted for Champell's murder on August 13, 2010. (*Id.* ¶ 25).

Evidence exculpating Plaintiff of involvement with the crime was discovered at various points both before and after his indictment. (*Id.* ¶¶ 22-30, 35). Of consequence to this case were the results of a ballistics analysis of the shell casings recovered from the crime scene. The amended complaint is vague with respect to both the results of these ballistics tests and the timeline in which they became known to the police and prosecutors. However, it appears that the shell casings matched those recovered from two other shootings which were known, or alleged, to have been committed by a different perpetrator, Shamiek Corbett (**"Corbett"**). (*Id.* ¶¶ 27-30).[1] The amended complaint suggests that the NYPD became aware of the match in April 2011. (*Id.* ¶¶ 27-28).[2] The amended complaint does not state when, precisely, this evidence was turned over to the QCDA, which was prosecuting Plaintiff's case. However, it is clear that the QCDA did not disclose it to Plaintiff's defense team until May 2014, during jury selection for Plaintiff's criminal trial. (*Id.* ¶ 31).

Following this belated disclosure, the trial court directed the Assistant District Attorney "to re-examine the evidence" and declared a mistrial. (*Id.*. ¶¶ 31, 32; Depoian Decl. Ex. B, at 7:7-17, ECF No. 26-2). The court also ruled that Plaintiff would be allowed to introduce the

---

[1] According to the amended complaint, Corbett "plead[ed] guilty to" one of the shootings and "was charged" with the other. (Am. Compl. ¶ 28).

[2] The amended complaint alleges that, "[o]n August 10, 2010, Det[ective] Torres contacted Detective Tranchina to compare 9 mm discharged shells recovered from the Champell [m]urder scene with 9 mm shells found at the scene of an attempted robbery and a murder." (Am. Compl. ¶ 24). "On April 14, 2011 and April 21, 2011, the discharged shell casings in the Champell murder were linked to another crime involving the same shell casings on August 5, 2011 [*sic*], … which Shamiek Corbett was already in prison for." (*Id.* ¶ 27). "On May 2, 2013, Det[ective] Lusk reviewed a lab report which found that shell casings recovered at the scene of the Champell murder matched the shell casings for another homicide that Shamiek Corbett was charged with and also matched the shell casings found at the scene of a murder to which Shamiek Corbett had plead[ed] guilty []." (*Id.* ¶ 28). The amended complaint does not identify Detectives Torres, Tranchina, or Lusk outside of these statements or explain how they came to be involved in the investigation; however, it may be inferred that they were members of the NYPD.

ballistics evidence at trial. (Depoian Decl. Ex. B at 8:4-6). In addition, "[a]s a result of this late disclosure," the court held hearings on December 19, 2014 and January 16, 2015 into "whether [the Assistant District Attorney] failed to turn over exculpatory material." (*Id.* ¶¶ 31, 32).[3] Plaintiff moved to dismiss the indictment pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), which the Court denied on February 13, 2015. (Depoian Decl. Ex. B, at 9:11-10:22).

Plaintiff was not re-tried until the fall of 2015 (Am. Compl. ¶ 34). During the course of this trial, the prosecution disclosed for the first time that a cellphone was found at the crime scene which—as characterized in the amended complaint—"belong[ed] to the same suspect who used the murder weapon." (*Id.* ¶ 35). Although this description is somewhat confusing, it would appear that Plaintiff is alleging that the cellphone belonged to Corbett.

On December 10, 2015, Plaintiff was acquitted of all charges and released from custody. (*Id.* ¶ 34-36). By then, he had been incarcerated pending trial for more than five years, including more than 1 ½ years that had elapsed after his trial was initially scheduled to have begun in May 2014. (*Id.* ¶ 1).

Plaintiff commenced this action on December 7, 2016 and filed his amended complaint on August 21, 2017.

## DISCUSSION

### I. Plaintiff's § 1983 Claims

The amended complaint is inartfully and at times confusingly drafted. Plaintiff alleges that the QCDA and NYPD:

> … withheld favorable material evidence from the plaintiff and his attorney, presented false and misleading testimony and argument against the plaintiff at his trial, failed to correct such testimony and argument, acted to conceal the aforementioned wrongdoing

---

[3] The amended complaint does not specify what transpired during these hearings.

from the plaintiff and his attorney, and perpetuated and ratified such misconduct during the trial of the plaintiff.

(*Id.* ¶¶ 48, 59). He also alleges that the NYPD and QCDA "violated the Plaintiff's right to be free from an illegal search and seizure by arresting him with evidence that was exculpatory to him," and that, "as a result of the arrest, plaintiff's parole and/or probation was violated, and he was a State Prisoner who had to serve out his time for the violation." (*Id.* ¶¶ 50, 61). He variously grounds his § 1983 claims in the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as the Supreme Court's holding in *Brady*. (*Id.*).

For reasons that are unclear, Plaintiff has only named the City of New York as a Defendant. He does not name any individual defendants, even under fictitious names. He alleges that the above-described constitutional violations were "directly, proximately and substantially caused by conduct, chargeable to the City of New York" and brings two separate *Monell* claims[4] against the City based on the alleged misconduct of the NYPD and QCDA, respectively. (*Id.* ¶¶ 52, 63).

As discussed more fully below, several aspects of Plaintiff's § 1983 claims may be dismissed out of hand. *See* Discussion I.3, *infra.* However, his claims that the NYPD and QCDA unconstitutionally withheld exculpatory evidence may survive. While the proceedings against Plaintiff were pending, the NYPD became aware of ballistics evidence linking the shooting to Corbett, and a cellphone "belonging to the same suspect who used the murder weapon," *viz.*, Corbett, was "found at the scene of the crime."[5] Yet this evidence was not disclosed to Plaintiff

---

[4] Pursuant to *Monell v. Department of Social Services of the City of New York*, a municipality may be sued under § 1983 if the plaintiff's constitutional injury resulted from a municipal "policy or custom." 436 U.S. 658, 694 (1978).

[5] The amended complaint does not state precisely when the cellphone was found. However, "drawing all reasonable inferences in favor of [Plaintiff]," as the Court must, *Empire Merchants*,

until 2014 and 2015, respectively. The obvious inference from this timeline is that at least one of the following occurred: either the NYPD delayed in forwarding the ballistics match to the QCDA; or the QCDA, after receiving the evidence, withheld it for a period of time from Plaintiff's defense team. We examine each possibility in turn.

1. <u>Plaintiff's claim as to the QCDA</u>

i. *<u>Whether Plaintiff has pleaded a constitutional violation by the QCDA</u>*

We turn first to Plaintiff's claim as it relates to the conduct of the QCDA. Prosecutors are individually immune from § 1983 liability for decisions undertaken in their prosecutorial capacity, including decisions regarding which evidence should be disclosed to a criminal defendant. *See Warney v. Monroe County*, 587 F.3d 113, 125 (2d Cir. 2009) ("[I]f the prosecutors had tested all the evidence, and then sat on the exculpatory results for at least 72 days, they may well have violated [*Brady*]; but they would be absolutely immune from personal liability"); *Ying Li v. City of New York*, 246 F.Supp.3d 578, 640 (E.D.N.Y. 2017) ("[A] prosecutor is entitled to absolute immunity even in the face of allegations of 'deliberate withholding of exculpatory information' or 'his knowing use of perjured testimony' ") (quoting *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005)). However, a plaintiff may maintain a *Monell* action against the relevant municipality if the prosecutors' constitutional

---

902 F.3d at 139 (citations and quotation marks omitted), it may be inferred that the cellphone was found and linked to Corbett well before it was disclosed to Plaintiff in the middle of his 2015 trial (Am. Compl. ¶ 35).

violations were caused by an "official municipal policy or custom." *Bellamy v. City of New York*, 914 F.3d 727, 756-761 (2d Cir. 2019); *see generally Monell*, 436 U.S. at 694.[6] [7]

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, … and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. at 281-282 (1999). Prosecutors are obligated to make *Brady* material available "in time for its effective use at trial or at a plea proceeding." *U.S. v. Coppa*, 267 F.3d 132, 147 (2d Cir. 2001). In this case, the QCDA's failure to do so may have cost Plaintiff his liberty. Specifically, it can be inferred from the amended complaint that the belated disclosure of the ballistics evidence in the middle of jury selection caused Plaintiff's trial to be postponed so that the parties could re-examine the evidence and the court could hold hearings as to whether the indictment should be dismissed under *Brady*. Throughout that entire time, Plaintiff remained incarcerated. Although the court did not ultimately dismiss the indictment, Plaintiff was not tried, acquitted, and released until December 2015, more than 1 ½ years after the trial was initially scheduled to begin. Had the State provided the ballistics and cellphone evidence early enough for Plaintiff to make effective use of them at his May 2014 trial, then it is "plausible," *Iqbal*, 556

---

[6] The City argues that the Supreme Court's decision in *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009) precludes a municipality from being held liable for its prosecutors' decisions concerning the disclosure of exculpatory or impeachment evidence. (Def. Mem. at 13-14, ECF No. 27). The Second Circuit rejected this precise argument in *Bellamy*, 914 F.3d at 759-760, which was decided after briefing was concluded on this motion. As the Second Circuit noted, "*Van de Kamp* said nothing about *Monell* or municipal liability" and simply held that prosecutorial immunity extends to individual supervisors who "fail[] to train or supervise their prosecutors to prevent violations of the duty to disclose impeachment material." *Id.* at 759.

[7] The proper municipality for *Monell* purposes is the City of New York where assistant district attorneys in the City are alleged to have withheld exculpatory evidence. *See Bellamy*, 914 F.3d at 758; *Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992).

U.S. at 678; *Twombly*, 550 U.S. at 570, that he would have been acquitted and released much sooner. This extra period of confinement constitutes Plaintiff's injury.

The question remains whether this was an injury of constitutional dimension. The City argues that a plaintiff cannot bring a "*Brady*" claim under § 1983 unless he was actually convicted as a result of the *Brady* violation (Def. Mem. at 8-9), a rule most courts have concurred with, *see Cannistraci v. Kirsopp*, No. 10-CV-980 (MAD) (DRH), 2012 WL 1801733, at *13-*17 (N.D.N.Y. May 16, 2012); *Grenier v. Jonas*, No. 09-CV-121, 2010 WL 883743, at *2 (D. Vt. Mar. 5, 2010); *Ambrose v. City of New York*, 623 F.Supp.2d 454, 467-473 (S.D.N.Y. 2009). However, the view that the legal effect of a *Brady* violation has significance only upon a conviction has not been definitively embraced by the Second Circuit, and may be persuasively called into doubt.[8] In any event, the question of whether a "*Brady*" claim may be brought by an

---

[8] Cases holding that an acquittal bars a *Brady* claim under § 1983 have usually seized on language in Supreme Court cases interpreting and applying *Brady*. *See, e.g., Cannistraci*, 2012 WL 1801733, at *14-*15; *Ambrose*, 623 F.Supp.2d at 468, 471 n. 6. Taken out of context, these Supreme Court opinions describe the State's *Brady* obligations as concerned only with the outcome of the defendant's trial. *See Strickler*, 527 U.S. at 281 ("[S]trictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict"); *Kyles v. Whitley*, 514 U.S. 419, 435 (1995) ("One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonable be taken to put the whole case in such a different light as to undermine confidence in the verdict"); *U.S. v. Bagley*, 473 U.S. 667, 682 (1985) ("The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome"); *U.S. v. Agurs*, 427 U.S. 97, 104 (1976) ("[I]mplicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial"); *id.* at 108 ("[T]he prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial").

These passages, however, are all taken from cases outlining the State's *Brady* obligations in the context of post-conviction proceedings. The importance of this point cannot be overstated. The Supreme Court has only had the opportunity to define what it means for the State to violate "*Brady*" in cases where a conviction was presupposed, and where the only relief being sought

acquitted plaintiff is academic. In cases where a plaintiff has been deprived of his liberty prior to trial due to the State's suppression of exculpatory evidence, courts have recognized that he may bring a § 1983 claim under the Fourth Amendment.

The key case on point is *Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007), *cert. denied*, 552 U.S. 818 (2007). Christopher Russo was arrested and charged with robbing an auto service station; he remained in custody for seven months before the charges were dismissed. *See id.* at 199. While in custody, Russo was informed by the police that they had video surveillance of the robbery. *See id.* at 100. Russo, who had prominent tattoos throughout his body, beseeched the police to examine the video to see whether the perpetrator had tattoos. *See id.* The officers falsely told Russo that the video showed a perpetrator with tattoos. *See id.* The footage, which was kept in a locked drawer of one of the officer's desks, was then concealed from prosecutors for more than two months. *See id.* at 201, 206. After the tape was turned over to an investigator with the State Attorney's Office, the investigator determined that it did not show the perpetrator clearly, and requested a laboratory enhancement of the footage. *See id.* at 201. After enhancement, the tape showed that the perpetrator did *not* have tattoos consistent with Russo's. *See id.* at 199-200, 202-203. The tape was not surrendered to the defense until approximately six months after Russo's arrest, and, upon the insistence of Russo's attorney, the prosecutor viewed the videotape for the first time roughly seven months after the arrest. *See id.* at 201-202. The

---

was vacatur of the actual conviction or sentence. In these cases, the only relevant consideration, as far as "prejudice" was concerned, was the effect of the nondisclosure on the trial itself. Placed in their proper context, these cases merely establish that ***post-conviction relief*** is not warranted unless "there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281. In none of these cases was the Supreme Court called upon to consider whether a ***civil § 1983 action for damages*** can be maintained where, as here, the State's suppression of exculpatory evidence has injured the plaintiff in another way, that is, by prolonging his pretrial incarceration.

State requested a *nolle prosequi* the following day, and the charges were dismissed. *See id.* at 202. Thereafter, the plaintiff brought an action pursuant to § 1983.

The Second Circuit held that there was a constitutional right, grounded in the Fourth Amendment, "to be free from continued detention after it was or should have been known that the detainee was entitled to release." *Id.* at 207 (quoting *Cannon v. Macon County*, 1 F.3d 1558, 1563 (11th Cir. 1993)); *see also id.* at 208-209 (reasoning that this constitutional right is grounded in the Fourth Amendment, rather than the Due Process Clause as other circuits have held). Specifically, it held that a plaintiff may prevail on an excessive detention claim under § 1983 if he can show "(1) that he has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) that the actions of the officers violated that right, and (3) that the officers' conduct 'shocks the conscience.' " *Id.* at 205 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). On the facts in *Russo*, the Court agreed that Russo had a viable § 1983 claim stemming from the officers' "alleged mishandling of exculpatory evidence and failure to turn that evidence over to the prosecuting attorney which, in turn, prevented the prosecutor from complying with his duty to give the exculpatory evidence to the defense." *Id.* "[D]espite Russo's repeated attempts to focus attention to the tape," the Court observed, "it took more than six months for that tape to reach Russo's counsel, and more than seven months before Russo was released from prison." *Id.* at 206.

The *Russo* Court did not mention *Brady*. However, it is clear that the constitutional violation that occurred in *Russo*—namely, the defendant-officers' failure to turn the footage over to prosecutors, which prevented them from discharging their own duty to disclose it to Russo, *see* 479 F.3d at 205—was akin to breach of their *Brady* obligations. *Brady* suppression can occur

even "when the government fails to turn over evidence that is 'known only to police investigators and not to the prosecutor,' " *Youngblood v. West Virginia*, 547 U.S. 867, 869-870 (2006) (quoting *Kyles,* 514 U.S. at 438), and "[t]he police therefore are under a duty to disclose exculpatory information to the prosecutor," *Hauptmann v. Wilentz*, 570 F.Supp. 351 (D.N.J. 1983), *aff'd*, 770 F.2d 1070 (3d Cir. 1985). Although the "*Brady*" rule is, strictly speaking, a creature of the Due Process Clause, *see* 373 U.S. at 87, the plaintiff's claim in *Russo* was cognizable under the Fourth Amendment because the officers' failure to forward the video tape to prosecutors resulted in a *pretrial* deprivation of liberty rather than an actual conviction. *See Manuel v. City of Joliet, Ill.*, 137 S.Ct. 911, 920 (2017) (holding that "the Fourth Amendment governs a claim for unlawful pretrial detention…."").

It might be argued that *Russo* is distinguishable on the grounds that the misconduct in that case was committed by the police, rather than by prosecutors. However, there is no basis in law or logic to narrow *Russo*'s reasoning to police officers.[9] Indeed, at least one court has suggested that a Fourth Amendment *Monell* claim may be brought against the City where a plaintiff's pretrial confinement was prolonged by the prosecution's own suppression of exculpatory evidence. In *Ambrose*, *supra,* the plaintiff was charged with participating in a fatal shooting, but was acquitted on all counts. *See* 623 F.Supp.2d at 461. He later brought a § 1983 action, alleging that the assistant district attorney "failed to honor her obligation under [*Brady*] to

---

[9] The distinction between § 1983 defendants acting in an investigative capacity and those acting in a prosecutorial capacity is relevant only to the narrow question of prosecutorial immunity—a question that is entirely irrelevant where, as here, it is the City itself that is being sued under *Monell*. *See Lopez v. City of New York*, 105 F.Supp.3d 242, 251 (E.D.N.Y. 2015) ("Defendants do not argue—and I am aware of no authority that would suggest—that her entitlement to absolute immunity as an individual defendant means *per se* that any violation of § 1983 cannot give rise to a claim against the City under [*Monell*], assuming that the other requirements for pleading such a claim are met").

provide exculpatory information for use at trial." *Id.* at 466. Specifically, according to plaintiff, the assistant district attorney failed to timely disclose two witness statements exculpating Plaintiff of involvement in the shooting. *See id.* at 460, 461, 467-468. Because the plaintiff was acquitted, the court dismissed his so-called "*Brady*" claim insofar as it was grounded in the Due Process Clause. *See id.* at 467-473. Nevertheless, it declined to dismiss his Fourth Amendment *Monell* claim against the City based on "the suppression of exculpatory evidence." *Id.* at 478. Specifically, the court allowed the plaintiff to proceed with the claim "that the City failed to train [its employees] as to malicious prosecution, which resulted in several malicious actions taken by the Individual Defendants and [the Assistant District Attorney], including their decision to withhold favorable evidence from Plaintiff—evidence which, if disclosed to Plaintiff, might have resulted in the dismissal of the prosecution and the speedier release of Plaintiff from detention." *Id.*

Here, similar to both *Russo* and *Ambrose*, Plaintiff alleges that the QCDA violated *Brady* and withheld evidence which, if disclosed sooner, might have resulted in his earlier release. Thus, Plaintiff has pleaded the first two elements of a *Russo* violation, namely, that he has a right to be free from continued detention stemming from the State's mishandling or suppression of exculpatory evidence, and that the actions of the defendant violated that right. *See* 479 F.3d at 205.

As for the third *Russo* element, Plaintiff has adequately pleaded conduct that "shocks the conscience," *id.* (citations and quotation marks omitted), a standard easily satisfied at the motion to dismiss stage where "all reasonable inferences" must be "draw[n] … in favor of the plaintiff," *Empire Merchants*, 902 F.3d at 139 (citations and quotation marks omitted). An official's behavior "shocks the conscience" within the meaning of *Russo* when they act with "deliberate

indifference to [an individual's] constitutional rights." 479 F.3d at 210. The standard is therefore equivalent to recklessness. *See Arroyo v. Schaefer*, 548 F.2d 47, 49 (2d Cir. 1977) (defining "conduct which 'shocks the conscience' " as "circumstances indicating an evil intent, or recklessness, or at least deliberate indifference to the consequences of his conduct…") (citations and quotation marks omitted); *see also Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) (defining "culpable recklessness" as "an act or failure to act … that evinces a conscious disregard of a substantial risk of serious harm") (quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)). Here, the exculpatory nature of the ballistics match and cellphone was self-evident. Thus, Plaintiff is entitled to the inference, for purposes of this motion to dismiss, that the QCDA's failure to disclose this evidence amounted to reckless indifference to its exculpatory potential, rather than mere negligence or inadvertence.

Plaintiff has therefore pleaded a constitutional violation by the QCDA.

ii. *Whether the Court may consider the state trial court's findings regarding the* Brady *violation*

The City requests that the Court take judicial notice of, or in the alternative deem incorporated into the pleadings, certain findings made in the transcript of the February 13, 2015 hearing in Plaintiff's criminal case. (Def. Mem. at 3 n. 3). During that hearing, in which the court denied Plaintiff's motion to dismiss the indictment, the court found that "due to a bureaucratic error by the police department, the assigned assistant district attorney … was not informed of the ballistics match as she should have been under ordinary circumstances and in the existing policies and protocols." (Depoian Decl. Ex. B at 10:3-7). Nevertheless, it found that "the *Brady* violation which did occur" did not result "from intentional conduct by the assigned assistant," nor was the conduct of law enforcement "so egregious" that dismissal was required under *Brady*.

(*Id.* at 10:16-21). The City's argument appears to be that these findings show that the QCDA committed no constitutional violation.

Assuming, *arguendo*, that the Court could take notice of these findings for the truth of the matters asserted therein, *but see Fine*, 11 F.Supp.3d at 223, they are not as favorable as the City suggests. The trial court explicitly found that a "*Brady* violation … did occur." (Depoian Decl. Ex. B at 10:16-17). Although it did not find that the prosecution acted "intentional[ly]" or in a manner "so egregious" to warrant dismissal of the indictment (*id.* at 10:17-22), this says very little about whether Plaintiff's civil *Brady* claim has merit. Dismissal of an indictment under *Brady* is an "exceedingly rare sanction," *United States v. Bellomo*, 944 F.Supp. 1160, 1168 (S.D.N.Y. 1996), and, as discussed above, Plaintiff may maintain a § 1983 action based on the QCDA's suppression of exculpatory evidence even if the prosecutors acted with mere recklessness. Moreover, the court made no findings regarding the prosecution's alleged failure to disclose the cellphone found at the crime scene, which was not revealed until the autumn 2015 trial. (Am. Compl. ¶ 35).

Thus, the court's February 13, 2015 findings do not disturb this Court's conclusion that Plaintiff has adequately pleaded a constitutional violation by the QCDA.

iii. *Whether plaintiff may bring a* Monell *claim against the City based on the constitutional violations of the QCDA*

Having established that Plaintiff has pleaded a constitutional violation by the QCDA, the remaining question is whether the City itself may be held liable for this violation.

To state a claim for municipal liability under *Monell*, a plaintiff is required to allege "(1) a municipal custom, policy, usage, or practice that (2) is the 'moving force' behind the constitutional violation that he experiences." *Corso v. City of New York*, No. 17-CV-6096, 2018

WL 4538899, at *12 (S.D.N.Y. Sept. 20, 2018) (citations omitted). A plaintiff can satisfy the municipal policy requirement by alleging "a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware." *Benitez v. City of New York*, No. 17-CV-3827 (SJ) (SJB), 2018 WL 2973387, at *6 (E.D.N.Y. Jun. 13, 2018) (quoting *Brandon v. City of New York*, 705 F.Supp.2d 261, 277 (S.D.N.Y. 2010)). The plaintiff may also show "a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Id.* (quoting *Brandon*, 705 F.Supp.2d at 277).

The pleading standard for *Monell* claims is no greater than for any other claim subject to Federal Rule of Civil Procedure 8(a). *See Jackson v. Williams*, No. 16-CV-1137 (LEK) (CFH), 2017 WL 1162196, at *2 n. 1 (N.D.N.Y. Mar. 28, 2017) (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993)); *Poux v. County of Suffolk*, No. 09-CV-3081 (SJF) (WDW), 2010 WL 1849279, at *11 (E.D.N.Y. May 4, 2010). True, a plaintiff who "mere[ly] assert[s]" that a municipality has a custom or policy condoning or ratifying unconstitutional conduct, "in the absence of allegations of fact tending to support, at least circumstantially, such an inference," has not adequately pleaded a *Monell* claim. *Montero v. City of Yonkers, New York*, 890 F.3d 386, 403-404 (2d Cir. 2018) (quoting *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993), *abrogated on other grounds, Leatherman, supra*). *See also Benitez*, 2018 WL 2973387, at *6 ("For a *Monell* claim to survive a motion to dismiss, a plaintiff must allege sufficient factual detail and not mere boilerplate allegations….") (quoting *Ying Li*, 246 F.Supp.3d at 636). But this is simply a restatement of the standard applicable to notice pleading generally, namely, that a complaint must "plead[] factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

In *Benitez*, the Honorable Sterling Johnson Jr., found that the plaintiff had adequately pleaded a *Monell* claim against the City based on the misconduct of the same District Attorney's Office that prosecuted Plaintiff's case here. *See* 2018 WL 2973387, at *6. The core allegation in *Benitez*, as it related to the City's liability under *Monell*, was that the QCDA failed "to properly instruct, train, supervise and/or discipline employees" with regard to, *inter alia*, their "continuing obligation to timely and fully disclose material favorable to the defense as set forth in [*Brady*]." Compl., *Benitez*, No. 17-CV-3827, Dkt No. 19, ¶¶ 114(a)(iv), 115 (E.D.N.Y. Oct. 13, 2017) (hereinafter **"*Benitez* Complaint"**). "Instead of disciplining such prosecutors," according to the plaintiff, "the District Attorney's policy, custom or practice was to give them raises, promotions and commendations, based in part on their record of winning at trial and extracting guilty pleas even in weak cases." *Id.* ¶ 118. Attached to the complaint was a compilation of 118 cases involving prosecutorial misconduct by the QCDA, including more than 30 cases from 1985 to 2015 in which courts found that the QCDA had withheld *Brady* or *Rosario*[10] material. *Id.* Ex. A. Ultimately, the court held that this "litany of cases where courts have found that Queens County prosecutors violated the fair trial rights of criminal defendants by withholding *Brady* and other material" was "sufficient to support an inference that the alleged policy and practice exists." *Benitez*, 2018 WL 2973387, at *6.

Plaintiff's *Monell* claims are structured similarly to those in *Benitez.* He alleges that the City instituted and implemented "unlawful policies, procedures, regulations, practices and/or

---

[10] Pursuant to *People v. Rosario*, 9 N.Y.2d 286 (N.Y. 1961), *cert. denied*, 368 U.S. 866 (1961), the prosecution must turn over prior statements of the prosecution's witnesses in New York State criminal proceedings. There is no federal constitutional requirement similar to *Rosario*.

customs concerning the continuing obligation to make timely disclosure to the defense" and averts that there was "deliberate indifference by policymaking officials at the [QCDA] in its obligation to properly train, instruct, supervise and discipline its employees, including the ADAs involved in the prosecution of the plaintiff's case, with respect to such matters." (Am. Compl. ¶ 52). Importantly, Plaintiff cites 87 cases of prosecutorial misconduct by the QCDA between 1985 and 2004, including 28 cases in which the QCDA withheld *Brady* or *Rosario* material. (*Id.* ¶ 38 & Ex. A). This list of cases largely overlaps with the one submitted in *Benitez* and, as in *Benitez*, the Court finds that it is circumstantial evidence of a pattern and practice of which municipal policymakers "must have been aware." *Benitez*, 2018 WL 2973387, at *6; *Brandon*, 705 F.Supp.2d at 277.

The City suggests that the cases compiled by Plaintiff lack probative value because they do not extend to the precise timeframe of Plaintiff's prosecution, between 2010 and 2015. (Def. Mem. at 17). But the weight to be afforded such evidence is a question for the trier of fact; on a motion to dismiss, by contrast, we are concerned only with "plausibility." *Iqbal*, 556 U.S. at 678. At this stage of the proceedings, Plaintiff is entitled to the reasonable inference that the alleged pattern and practice did not simply dissipate, but remained in effect when he was prosecuted. *See Jund v. Town of Hempstead*, 941 F.2d 1271, 1288 (2d Cir. 1991) ("There is a general presumption of the continuance of a status or condition once proved to exist. … [A] presumption of continuity is a reasonable grounds on which to draw inferences where (1) a situation or the circumstances surrounding it do not go through an apparent material change and (2) the lapse of

time is not great enough to suggest that unknown circumstances or causes, in the normal course of events, will have changed the situation") (internal citations and quotation marks omitted).[11]

To be sure, discovery may reveal that no such policy existed at the time of the proceedings against Plaintiff, if it ever existed at all. But "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.' " *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)); *accord Iqbal*, 556 U.S. at 696 (Souter, J., dissenting). For purposes of this motion to dismiss, Plaintiff's allegations push his *Monell* claim over the line from "mere[ly] possib[le]" to "plausible." *Iqbal*, 556 U.S. at 679. Accordingly, the City's motion to dismiss Plaintiff's *Monell* claim as it relates to the conduct of the QCDA is denied.

2.    Plaintiff's claim as to the NYPD

i.    *Whether Plaintiff has pleaded a constitutional violation by the NYPD*

We turn next to the theory that the NYPD wrongfully delayed in disclosing evidence to the QCDA. Police officers who fail to provide exculpatory evidence to prosecutors may trigger multiple constitutional violations under § 1983. Where an officer causes the prosecution to initiate or continue criminal charges without disclosing evidence that would negate probable cause, the officer may be liable for malicious prosecution. *See Dufort v. City of New York*, 874 F.3d 338, 355 n. 7 (2d Cir. 2017) ("[C]laims for pretrial detention based on fabricated or withheld evidence are evaluated as malicious prosecution claims under the Fourth Amendment") (citing *Manuel*, 137 S.Ct. at 917-919); *Nzegwu v. Friedman*, 605 Fed. Appx. 27, 31 (2d Cir. 2015) (summary order) (officers "could nevertheless be liable [for malicious prosecution] if they

---

[11] In *Jund*, the Second Circuit, citing the presumption of continuity, held, in a civil RICO action, that a jury could properly infer that a town's practice of coercively soliciting political contributions between 1973 and 1976 continued to exist in 1978. *See* 941 F.2d at 1288.

withheld pertinent information from the prosecutor, or misrepresented it"); *Kemp v. Lynch*, 275 A.D.2d 1024 (N.Y. App. Div. 4th Dept. 2000). Separately, the officer may be liable where they impede the prosecution's ability to abide by its own constitutional duty to disclose exculpatory evidence to the defense. *See Bellamy*, 914 F.3d at 751 ("When police officers withhold exculpatory or impeaching evidence from prosecutors, they may be held liable under § 1983 for violating the disclosure requirements of [*Brady*]") (citing *Bermudez v. City of New York*, 790 F.3d 368, 376 n. 4 (2d Cir. 2015)); *id.* at 751-756 (holding that defendant-officers could be sued under *Brady* where they failed to forward exculpatory witness statements to prosecutors, which, if disclosed at trial, would have significantly increased the defense's chances of sowing reasonable doubt as to his guilt); *Russo,* 479 F.3d at 205 (holding that officers may be sued for plaintiff's "prolonged detention" caused by defendants' "alleged mishandling of exculpatory evidence and failure to turn that evidence over to the prosecuting attorney which, in turn, prevented the prosecutor from complying with his duty to give the exculpatory evidence to the defense"). *See generally Fulford v. Maggio*, 692 F.2d 354, 358 n. 2 (5th Cir. 1982) ("The State's duty of disclosure is imposed not only upon its prosecutor, but also on the State as a whole, including its investigative agencies"), *rev'd on other grounds*, 462 U.S. 111 (1983).

However, in this case, Plaintiff does not expressly allege that the NYPD wrongfully withheld evidence from *prosecutors*. Instead, his only § 1983 claim as it relates to the NYPD is that it "withheld favorable material evidence *from the plaintiff and his attorney*." (Am. Compl. ¶ 59) (emphasis added). This fails to state a constitutional violation. As the Second Circuit held nearly three decades ago, "the police satisfy their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors." *Walker*, 974 F.2d at 299. Thereafter, it is the responsibility of the prosecutors, not the police, to ensure that *Brady* material is disclosed to the

defense. *See id.* ("[T]he defendant's appropriate point of contact with the government during litigation is the prosecutor and not [the police] who will be witnesses against him").

Because Plaintiff has failed to explicitly allege a constitutional violation by the NYPD, he cannot maintain a *Monell* claim against the City based on the NYPD's alleged misconduct. *See Matican v. City of New York*, 524 F.3d 151, 154 (2d Cir. 2008).

ii.     *Leave to amend pursuant to Rule 15(a)*

Plaintiff explicitly requests leave to amend the complaint pursuant to Federal Rule of Civil Procedure 15(a) "within thirty days of the [Court's] decision, should [the] Court hold that the Complaint fails to allege specific facts to support the causes of action alleged herein, and to permit plaintiff to provide whatever additional facts … may exist to support his claim." (Pl. Opp. at 15, ECF No. 33). This is Plaintiff's second request for an amendment.

Federal Rule of Civil Procedure 15(a)(2) provides that "[t]he court should freely give leave" to amend "when justice so requires." "Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend." *Lucente v. International Business Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (quoting *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). An amendment is "futile," and hence may be denied, "if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Id.* (citing *Doughtery v. North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002)).

In this case, the Court deems it appropriate to allow Plaintiff to amend his § 1983 claim to include an explicit allegation that the NYPD failed to forward exculpatory evidence to the QCDA. As noted above, the factual portion of the complaint amply supports the inference that

the NYPD did not disclose evidence to prosecutors when it should have.[12] It is plausible that, had the ballistics evidence and cellphone been received by the QCDA more promptly, they would have influenced the decision to continue the charges against Plaintiff rather than dismiss them without further action. It is also plausible that the belated disclosure of this evidence contributed to the QCDA's *own* failure to abide by its obligations under *Brady*, which itself resulted in the postponement of trial and prolonged the amount of time that Plaintiff would remain incarcerated. Therefore, allowing Plaintiff to amend the complaint will not be futile.

The amended complaint, in its current form, does not allege any facts—only "mere assertion[s]," *Montero*, 890 F.3d at 403; *Dwares*, 985 F.2d at 100—that there was a municipal pattern or practice that caused the NYPD to withhold evidence from prosecutors, or that tolerated or ratified such conduct. (Am. Compl. ¶¶ 63-65). The compendium of judicial decisions attached to the amended complaint describes occasions where the QCDA withheld evidence, not where the NYPD did so. Accordingly, should Plaintiff desire to amend the complaint, he must furnish additional facts from which such a policy or custom can be inferred. Alternatively, Plaintiff may join individual police officers as defendants under Federal Rule of Civil Procedure 21, *see Bridgeport Music, Inc. v. Universal Music Group, Inc.*, 248 F.R.D. 408, 412 (S.D.N.Y. 2008), in which case a showing of a municipal custom or policy will not be required.

For the reasons stated above, Plaintiff's § 1983 claim as it relates to the conduct of the NYPD is dismissed with leave to amend.

---

[12] The minutes of the February 13, 2015 proceedings in Plaintiff's criminal case also support the theory that the NYPD withheld the ballistics evidence from the QCDA. (Depoian Decl. Ex. B at 10:2-7) (finding that, "due to a bureaucratic error by the police department, the assigned assistant district attorney … was not informed of the ballistics match as she should have been under ordinary circumstances and in the existing policies and protocols").

3.     <u>Plaintiff's remaining § 1983 claims</u>

Plaintiff's remaining § 1983 claims are a veritable grab-bag of alleged constitutional violations which are not clearly delineated. For the reasons noted below, these claims may be easily dismissed.

i.     *<u>Presentation of, and failure to correct, false and misleading testimony and argument</u>*

Plaintiff alleges, in conclusory fashion, that the QCDA and NYPD both "presented false and misleading testimony and argument against the plaintiff at his trial" and "failed to correct such testimony and argument." (*Id.* ¶¶ 48, 59). However, "[t]o survive a motion to dismiss, a complaint must … plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citations omitted). Here, the amended complaint is utterly silent as to what false or misleading testimony or argument was introduced at trial, and there is not so much as a hint in the factual portion of the complaint that manufactured evidence was ever offered against Plaintiff. Accordingly, any claim that Plaintiff intends to bring on the basis of "false and misleading testimony and argument" is dismissed.

ii.     *<u>False arrest</u>*

Plaintiff's claim that the NYPD and QCDA "violated [his] right to be free from an illegal search and seizure by arresting him with evidence that was exculpatory to him" (Am. Compl. ¶¶ 50, 61) sounds in false arrest. However, any § 1983 claim for false arrest that Plaintiff may have is time-barred. The statute of limitations for false arrest actions brought under § 1983 in New York is three years, *see Owens v. Okure*, 488 U.S. 235 (1989), accruing when the plaintiff "is bound over by a magistrate or arraigned on charges." *Wallace v. Kato*, 548 U.S. 384, 389 (2007). Although the amended complaint does not say when, precisely, Plaintiff was arraigned, it may be

presumed that it was in August 2010, as he was arrested on or about August 5, 2010. (Am. Compl. ¶¶ 11-17). Therefore, the statute of limitations for Plaintiff's § 1983 false arrest claim would have expired in August 2013, long before this action was commenced, in December 2016.

Accordingly, Plaintiff's § 1983 claim for false arrest is dismissed.

iii.  *Fifth and Eighth Amendment claims*

Plaintiff also invokes the Fifth and Eighth Amendments to the United States Constitution in connection with his § 1983 claims. (Am. Compl. ¶¶ 50, 61). The Fifth Amendment applies only against the federal government and, as such, does not supply a basis for Plaintiff's claims here. *See Ambrose*, 623 F.Supp.2d at 466-467. Plaintiff's Eighth Amendment claim also fails, as he has alleged no facts from which it could be inferred that he suffered "cruel and unusual punishments." U.S. Const. Amdt. VIII.

**II.     Plaintiff's State Law Claims**

Plaintiff brings state law claims against the City for false arrest, malicious prosecution, and breach of a duty to "train[,] supervise and otherwise control its Police Officers in the proper methods of providing exculpatory evidence." His state law claims, like his § 1983 claims, are brought solely against the City. However, unlike his § 1983 claims, they pertain solely to the conduct of NYPD officers and not to the conduct of any prosecutors within the QCDA. Because the motion to dismiss Plaintiff's § 1983 claims is denied in part, *see* Discussion I.1, *supra*, the Court exercises supplemental jurisdiction over all of the state law claims. *See* 28 U.S.C. § 1367.

i.  *False arrest*

A municipality may be sued under New York law for false arrest pursuant to ordinary principles of *respondeat superior*. *Theodat v. City of New York*, No. 16-CV-3977 (FB) (SJB), 2018 WL 3825886, at *5 (E.D.N.Y. Aug. 10, 2018). Unlike a federal *Monell* claim under § 1983,

there is no requirement that the plaintiff demonstrate that the tort was caused by a municipal custom or policy.

To prevail on a claim of false arrest under New York law, the plaintiff must establish "(1) intentional confinement by the defendant, (2) of which the plaintiff was aware, (3) to which the plaintiff did not consent, and (4) which was not otherwise privileged." *Grant v. City of New York*, No. 16-CV-3635 (ILG) (ST), 2019 WL 1099945, at *5 (E.D.N.Y. Mar. 8, 2019) (citing *Broughton v. State*, 37 N.Y.2d 451, 456 (N.Y. 1975), *cert. denied*, 423 U.S. 929 (1975)). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.' " *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)). "Probable cause is established 'when the arresting officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." ' " *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (quoting *O'Neill v. Town of Babylon*, 986 F.2d 646, 650 (2d Cir. 1993)).

Here, Plaintiff has not pleaded sufficient facts from which the absence of probable cause may be inferred. He alleges only that the walked over to the scene of the shooting after he heard gunshots, and that the police encountered him and placed him under arrest. (Am. Compl. ¶¶ 14, 17). The only other relevant detail provided in the amended complaint is that Plaintiff possessed no weapon on him when he was arrested. (*Id.* ¶ 19). The complaint does not say whether Plaintiff arrived at the crime scene before or after the police, nor does it describe what, if anything, was said between Plaintiff and the officers. These threadbare allegations, standing alone, do not permit the inference that the police lacked probable cause.

In support of his false arrest claim, Plaintiff alleges that "[t]here was no physical evidence linking the plaintiff to the alleged crime; there was [*sic*] no latent fingerprints of his found, there was no gun[shot] residue, there was no weapon found, and there was exculpatory evidence, linking the shell casings found at the scene of the murder with another criminal case in which an unrelated individual pleaded guilty to [*sic*]." (Am. Compl. ¶ 41). However, for purposes of a false arrest claim, probable cause is evaluated "at the time of the arrest." 916 F.Supp.2d 235, 241 (E.D.N.Y. 2012). Plaintiff does not claim that any of this evidence was, or should have been, known to the officers when they arrested him.

Accordingly, Plaintiff's state law false arrest claim is dismissed.

ii.     *Malicious prosecution*

Like a state law false arrest claim, a state law malicious prosecution claim may be brought against a municipality under *respondeat superior. See Grant*, 2019 WL 1099945, at *10. To prevail on a claim for malicious prosecution under New York law, the plaintiff must establish "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendants' actions." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010).

Even where probable cause exists at the time of arrest, "[a] malicious prosecution claim can rest on a prosecution that is continued notwithstanding the discovery of information that exculpates the defendant." *Kinzer v. Jackson*, 316 F.3d 139, 143-144 (2d Cir. 2003). Where the police discover exculpatory information and fail to forward it to prosecutors, they may be deemed to have initiated or continued the proceedings and may be held liable for malicious prosecution, provided the remaining elements of the tort—that is, termination in plaintiff's favor,

lack of probable cause, and actual malice—are satisfied. *See Nzegwu*, 605 Fed. Appx. at 31 ("…

Defendants could nevertheless be liable [for malicious prosecution] if they withheld pertinent

information from the prosecutor, or misrepresented it"); *Kemp, supra.*

 In *Kemp*, the Fourth Department held that the police "had probable cause to arrest

plaintiff" for harassment in the second degree "based on the complainant's initial statement";

however, "that probable cause was subsequently dissipated when defendant," a New York State

Trooper, "learned of exculpatory material during his investigation of plaintiff." 275 A.D.2d at

1025. "Although the information in plaintiff's personnel file was largely exculpatory to plaintiff

and the file contained statements of witnesses, defendant failed to turn over the file or his report

to the District Attorney's office prior to the criminal prosecution of plaintiff." *Id.* On these facts,

the Appellate Division affirmed a judgment awarding the plaintiff damages for malicious

prosecution. *See id.*

 This case is similar to *Kemp*. Although Plaintiff's initial arrest may have been supported

by probable cause, he is entitled to the inference, at this stage in the proceedings, that probable

cause was negated when the police learned of the ballistics match and the cellphone, both of

which incriminated Corbett in the shooting rather than Plaintiff. The timeline of events in the

amended complaint suggests that the police delayed in furnishing this evidence to prosecutors.

Although the evidence was eventually disclosed, it is "plausible," *Iqbal*, 556 U.S. at 678;

*Twombly*, 550 U.S. at 570, that prosecutors were less inclined to dismiss the charges against

Plaintiff after having received the evidence at such a late stage in the proceedings. In other

words, it is plausible that, had the NYPD made its required disclosures at an earlier point in time,

the QCDA would have made a judgment to drop the charges. Although the facts revealed in

discovery may very well refute this theory, Plaintiff has alleged sufficient factual matter for his malicious prosecution claim to survive a motion to dismiss.

iii.    _Negligent training and supervision_

Plaintiff's final claim is for the NYPD's alleged negligence in properly training and supervising its officers and in maintaining proper systems for the coordination of forensic evidence. (Am. Compl. ¶ 71). However, New York law does not recognize a cause of action for negligence in handling a criminal prosecution. _See McCray v. City of New York_, Nos. 03-CV-9685 (DAB), 03-CV-9974 (DAB), 03-CV-10080 (DAB), 2007 WL 4352748, at *29 (S.D.N.Y. Dec. 11, 2007); _Jenkins v. City of New York_, No. 91-CV-3639 (RLC), 1992 WL 147647, at *8 (S.D.N.Y. Jun. 15, 1992); _Coyne v. State_, 120 A.D.2d 769, 770 (N.Y. App. Div. 3d Dept. 1986); _Jestic v. Long Island Savings Bank_, 81 A.D.2d 255, 258 (N.Y. App. Div. 2d Dept. 1981):

> The case law is well settled that, on public policy grounds, no legally cognizable cause of action exists for negligent investigation of a crime and claimant's only avenue of relief is by way of the traditional remedies of false arrest and malicious prosecution suits. The same result is reached under the doctrine that a governmental entity cannot be held liable for negligence in the performance of a governmental function, including police and firefighting activity, unless a special relationship existed with the injured party.

_Coyne_, 120 A.D.2d at 770 (internal citations omitted).

Accordingly, Plaintiff's negligent training and supervision claim is dismissed.

## CONCLUSION

For the foregoing reasons, the City's motion to dismiss is:

1.    **DENIED** with respect to Plaintiff's _Monell_ claim that the QCDA "withheld favorable material evidence from plaintiff and his attorney" (Am. Compl. ¶ 48);

2.      **GRANTED** with respect to Plaintiff's *Monell* claim as it pertains to the NYPD (Am.

Compl. ¶¶ 59-69); *provided*, that Plaintiff's shall be permitted to amend the complaint with

respect to this claim within 30 days from the date of entry of this Memorandum and Order;

3.      **DENIED** with respect to Plaintiff's malicious prosecution claim (Am. Compl. ¶¶ 43-47);

and

4.      **GRANTED** as to all remaining claims.

          SO ORDERED.

Dated:          Brooklyn, New York
                August 22, 2019

                                              /s_____
                                              I. Leo Glasser                                    U.S.D.J.