UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

**NATHANIEL NEWSON,**

                         Plaintiff,

- against –

**THE CITY OF NEW YORK,**

                         Defendant.

**AMENDED COMPLAINT**

**PLAINTIFF DEMANDS TRIAL BY JURY**

16 CV 6773 (ILG)(JO)

-------------------------------------------------------------------X

      Plaintiff, by his attorney, ANDREW F. PLASSE & ASSOCIATES LLC., as and for his Amended Complaint, hereby alleges and shows to the Court the following, all upon information and belief:

      1   Plaintiff Nathaniel Newson hereby brings this action against the City of New York, for damages arising out of unconstitutional policies and actions arising from the alleged conduct of the Queens District Attorney's Office in knowingly withholding exculpatory evidence during the prosecution of the Plaintiff for Murder from August 5, 2010 to December 10, 2015. The alleged misconduct caused the plaintiff to spend over five years incarcerated. In addition, plaintiff also brings this action against the City of New York for his state claims against it for false arrest and malicious prosecution.

      2.   Plaintiff brings this action against the defendants to redress the deprivation of rights secured to him and the decedent's estate by the Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution, the parallel rights of the New York State Constitution, and 42 U.S.C Section 1983.

3. At the time of the incident herein, plaintiff was a resident of 57 East Stanley Ave., Brooklyn, NY.

4. Defendant City of New York is a municipal corporation of the State of New York with its address at 1 Centre Street, New York, NY.

5. That upon information and belief, the City of New York owned, operated, controlled and maintained the New York City Police Department by charter, or by law, under provisions of the State and/or City of New York

6. The District Attorney's ["D.A."] and Assistant District Attorneys of the Queens County ["ADAs"] are agents and employees of the City of New York with offices at 125-01 Queens Blvd., Kew Gardens, NY.

7. This Court has jurisdiction over this matter pursuant to 28 U.S.C. Sections 1331, 1332, and 1343(a) (3) and 42 U.S.C. Section 1983.

8. Venue is proper in this District pursuant to 28 U.S.C. Section 1381.

9. At all times hereinafter mentioned the defendants acted under color of state law or a statute, ordinance, regulation or custom.

10. That heretofore, the Plaintiff caused a Notice of claim in writing, sworn to by and on behalf of the Plaintiff, to be duly served upon the defendant City of New York by delivering a copy thereof to the Office of the Corporation Counsel of the City of New York, which said Notice of claim set forth the name and post office address of the plaintiff, the nature of the claim, the time when, the place where and the manner in which said claim arose and the items of damages or injuries claimed to have been sustained so far as then practicable; and that this action is being commenced within one year after the happening of the event upon which this claim is based.

## STATEMENT OF FACTS

11. Shameik Corbett was charged with the attempted murder of Kmar Horton for an incident occurring on August 3, 2010.

12. On August 5, 2010, Damian Champell was murdered while sitting in a black 2004 BMW at 147-67 109th Avenue, Queens, NY.

13. Damian Champell survived the shooting but was transported to Jamaica Hospital, where he was pronounced dead.

14. Trevor Bowen, Lance Hamilton, Willie Trotty and plaintiff Nathaniel Newson were arrested for the murder of Damian Champell.

15. Trevor Bowen, Lance Hamilton, Willie Trotty, Shameik Corbett, and Nathaniel Newson were allegedly members of the A Fam Gang.

16. An eyewitness known as "Diamond" identified Trevor Bowen, Lance, Hamilton, Willie Trotty and Nathaniel Newson as the perpetrators of the murder of Damian Champell.

17. Immediately upon their arrest, Trevor Bowen and Lance Hamilton informed the NYPD that Shameik Corbett committed the murder.

18. Plaintiff was not present at the scene of the murder when it occurred.

19. Plaintiff walked over to the scene because he heard gunshots

20. Plaintiff was a registered Confidential Informant

21. Plaintiff walked to the scene because he was acting in his capacity as a CI.

22. Plaintiff was arrested at the scene of the murder for Disorderly conduct.

23. Plaintiff was charged with Murder 2nd and for Possession of a Weapon.

24. Plaintiff had no weapon on him when he was arrested.

25. The discharged shell casings were collected as evidence by the New York City Police Department

26. Five 9 mm shell casings were recovered on the street and three 9 mm shell casings were recovered inside of Champell's BMW.

27. On August 6, 2010, the plaintiff was examined for gunshot residue, none of which was visually present on him, and on November 3, 2010, a lab report stated that there was no residue consistent with the discharge of a firearm on him.

28. On August 9, 2010, the lab reported that there were no latent prints of the plaintiff on the physical property of the victim, including his BMW.

29. On August 10, 2010, Det. Torres contacted Detective Tranchina to compare 9 mm discharged shells recovered from the Champell Murder scene with 9 mm shells found at the scene of an attempted robbery and a murder.

30. Plaintiff was indicted for the Murder of Damian Champell on August 13, 2010.

31. On August 16, 2010, NYPD had a positive report of a match for bullet fragments for the August 3, 2010 attempted murder and August 5, 2010 murder.

32. On August 16, 2010, there were IBIS generated reports made of the match between the 103rd Precinct and 113th Precinct which were investigating the August 3, 2010 attempted murder and August 5, 2010 murder.

33. On August 25, 2010, Detective DiConstanzo matched shell casing ballistic evidence from the Champell murder with the ballistics evidence from the attempted murder of Kmar Horton on August 3, 2010.

34. Detective DiConstanzo concluded that the ballistics evidence for the attempted murder of Kmar Horton, which Shameik Corbett was charged with, matched the ballistic evidence for the murder of Champell, that plaintiff was charged with.

35. A DD-5 was prepared by Sgt. Albarano of the results.

36. On January 18, 2011, Detective Shapiro notified ADA Ross of the results of the DNA forensics returned from the lab, that there was no blood spatter on the plaintiff from the victim.

37. In 2011, an 11 year old was found in possession in a public school of a 9 m Glock.

38. On April 14, 2011 ballistic tests matched the found gun as being involved in the August 3, 2010 attempted murder of Kmar Horton and for the murder of Champell.

39. On May 19, 2011, the Queens District Attorney obtained a copy of a letter from Corbett written to Trotty in which Corbett stated he knew who the murderer of Champell was.

40. In June 2011, a search warrant was granted and executed on Shameik Corbett's and Trevor Bowen's jail cell at Rikers Island to obtain copies of all letters he wrote.

41. On January 23, 2012, Shameik Corbett plead guilty to two separate felony indictments. One was for the attempted murder of Kmar Horton and the other was for a murder charge, for an incident occurring after August 5, 2010, in which Corbett plead guilty to Manslaughter.

42. On May 18, 2012, Detective DiConstanzo was asked by the Queens DA to again have the lab match the ballistic evidence of the August 3, 2010 and August 5, 2010 incidents.

43. On June 7, 2012, the NYPD again performed a test matching the cartridges of the Kmar Horton attempted murder with the murder of Champell finding that they were the same. Bullet fragments were also tested and found to match.

44. Det. Lusk was asked by Lt. Yule to close out some pending cases and to write a DD-5 about the ballistic match in August 2012.

45. Detective Lusk did not write the DD-5 until May 2, 2013.

46. The DD-5 written by Det Lusk reviewed a lab report which found that shell casings recovered at the scene of the Champell murder matched the shell casings for another homicide that Shamiek Corbett was charged, with and also matched shell casings found at the scene of a murder to which Shamiek Corbett had plead guilty to, meaning that the police lab forensic tests of cartridges and bullet fragments found that two crimes that Shameik Corbett plead guilty to, matched the cartridges and bullet fragments for the crime for which plaintiff and three others were charged with.

47. Detective Lusk was the shooting and Homicide coordinator in the 113th Precinct. His job was to see if shootings were related in other precincts.

48. Detective Lusk submitted the DD-5 nine months after he obtained the information to his Squad Commander Lt. Kenneth Yule.

49. The DD-5 stated that the ballistic evidence of the August 3, 2010 and August 5, 2010 matched, but that both cases were closed due to arrests and did not follow up on the matching evidence.

50. Lt. Kenneth Yule did not do any further follow up on the comparison.

51. On April 14, 2014, the NYPD were re-tested the evidence with the same results as above. The two cases that Corbett pled guilty to, had forensic evidence of discharged shell casings and bullet fragments that identically matched the discharged shell casings and bullet fragments found in the Champell murder.

52. Ballistic reports indicated that the gun used in the murder of Damian Champell was used two days earliest by Corbett, in a different attempted murder and robbery and in the case where Corbett had plead guilty to a Manslaughter conviction occurring after the plaintiff here was arrested on August 5, 2010.

53. This exculpatory evidence was not provided to the plaintiff's defense counsel and his co-defendant's counsel approximately four years later during jury selection in his Murder trial in May 2014, when during jury selection, Judge Richard Buchter directed ADA Karen Ross to re-examine the evidence in the case and ordered a Mistrial.

54. ADA Karen Ross had also prosecuted Shameik Corbett in a separate proceeding on both of his indictments.

55. During plea discussions with Corbett's attorney, ADA Karen Ross promised that Corbett would never be charged with the murder of Champell. ADA Karen Ross knew that Corbett was a suspect in the Champell murder.

56. As a result of this late disclosure, Court hearings were held on December 19, 2014 and January 16, 2015 as to whether ADA Karen Ross failed to turn over exculpatory material in a timely manner.

57. The Court Ordered a New Trial.

58. Plaintiff was re-tried on the Murder charge in Fall 2015.

59. During the retrial, additional exculpatory evidence, that Shameik Corbett within hours of the murder of Champell was in possession of his Champell's cell phone was disclosed for the first time during the course of the second trial.

60. At trial, 'Diamond' was not able to identify all of the defendants.


61. Upon information and belief, Diamond was promised a reduced sentence if she cooperated with the District Attorney.

62. Also for the first time during trial, the District Attorney turned over a surveillance video of the incident, with views from before and after the shooting, that failed to show the plaintiff Nathaniel Newson present when the shooting of Damian Champell occurred and that the ADA had withheld this video from the Plaintiff's criminal Defense attorney for years.

63. Plaintiff was acquitted of all charges on December 10, 2015.

## PLAINTIFF'S CLAIM

64. The failure to turn over Brady exculpatory material for years was more than wrongful conduct by one ADA. It was perpetuated and ratified by high level officials in the Queens District Attorney's Office, who tried to cover up the misconduct, and failing that, withheld additional exculpatory evidence.

65. This alleged misconduct by the Queens District Attorney, by concealing exculpatory evidence, favoring the defense, has a long history and has been the subject of prior lawsuits. Attached as Exhibit "A" is a partial list of cases demonstrating that the Queens District Attorney's Office failed to turn over exculpatory material.

66. Because the Queens District Attorney is a policy maker for the City of New York with respect to the administration of that office, the unlawful policies and practices complained of in tolerating such misconduct was the moving force and proximate cause of the plaintiff's detention for five years and the City is therefore liable to the plaintiff pursuant to Monell v. City of New York and 42 U.S.C. Section 1983.

**AS AND FOR A FIRST CAUSE OF ACTION FOR MALICIOUS PROSECUTION UNDER STATE LAW AGAINST DEFENDANT THE CITY OF NEW YORK, PLAINTIFF RESTATES AND REALLEGES EACH AND EVERY ALLEGATION SET**

## FORTH IN PARAGRPAHS MARKED AND ENUMERATED "1-66" AND FURTHER ALLEGES AS FOLLOWS:

67. That Police Officers, employees of the City of New York, as aforesaid, jointly and severally maliciously prosecuted the plaintiff causing him to sustain severe personal injuries.

68. There was no physical evidence linking the plaintiff to the alleged crime; there was no latent fingerprints of his found, there was no gun residue, there was no weapon found, and there was exculpatory evidence, linking the discharged shell casings and bullet fragments found at the scene of the murder with two other criminal cases both of which an unrelated individual, Shameik Corbett plead guilty to; that the defendant was told by Plaintiff's co-defendants that Corbett murdered Champell; that video evidence exculpated him; that a cell phone found in possession of Corbett was exculpatory evidence that was withheld for five years; that the complaining witnesses story of four men being present for the murder was inconsistent, totally with the video; and that as early as August 2010, exculpatory evidence was found which was not turned over to Newson's counsel until May 2014 during which time he was held at Rikers Island and then Coxsackie Correctional Facility.

69. Despite having this knowledge, the plaintiff was prosecuted for over five years until he was acquitted.

70. Plaintiff was a registered confidential informant and believes that this prosecution may have been retaliation against him for his failure to cooperate, and/or that the NYPD wished to arrest him for his gang related activities, but did not have enough evidence to do so, so it fabricated this case against him by failing to disclose exculpatory evidence, beginning in August 2010 when ballistic tests were performed and the culprit of the murder was identified by plaintiff's co-defendants.

71. That by reason of the foregoing, the plaintiff has been damaged in an amount which exceeds the jurisdictional limits of all lower state courts which would otherwise have jurisdiction.

**AS AND FOR A SECOND CAUSE OF ACTION FOR A FOURTH AMENDMENT MONELL CLAIM AGAINST DEFENDANT CITY OF NEW YORK, PLAINTIFF RESTATES AND REALLEGES EACH AND EVERY ALLEGATION SET FORTH IN PARAGRAPHS MARKED AND ENUMERATED "1-66" AND FURTHER ALLEGES AS FOLLOWS:**

72. Upon information and belief, acting individual and on behalf of the Queens District Attorney, ADAs withheld favorable material evidence from the plaintiff and his attorney, presented false and misleading testimony and argument against the plaintiff at his trial, failed to correct such testimony and argument, acted to conceal the aforementioned wrongdoing from the plaintiff and his attorney, and perpetuated and ratified such misconduct during the trial of the plaintiff.

73. The aforesaid conduct operated to deprive plaintiff of his rights under the Federal and State Constitution and the laws of the United States and New York State.

74. The Queens District Attorney and ADAs failure to timely disclose for use at trial all material evidence favorable to his defense, pursuant to Brady v. Maryland, 373 U.S., 83 (1963); the Queens District Attorney and ADAs used false or misleading testimony or argument knowingly and/or recklessly presented by prosecutors in violation of the Fourth Amendment and ADAs violated the Plaintiff's right to be free from an illegal search and seizure by arresting him with evidence that was exculpatory to him; as a result of the arrest, plaintiff's parole and/or probation was violated, and he was a State Prisoner who had to serve out his time for the violation, and the presentation of false evidence and/or failure to provide exculpatory evidence for four years after his arrest, violated his Eighth Amendment Rights.

75. The foregoing violated the plaintiff's constitutional rights by actions taken under color of State Law.

76. The foregoing violations of the plaintiff's constitutional rights were directly, proximately and substantially caused by conduct, chargeable to the City of New York, including the institution and implementation of unlawful policies, procedures, regulations, practices and/or customs concerning the continuing obligation to make timely disclosure to the defense, before and during the trial of material evidence favorable to the defense; the duty not to present at trial false, misleading improper or unreliable evidence, testimony, statements or argument; the continuing obligation to correct false inaccuracies, incomplete or misleading evidence, testimony, statements or argument, whenever such acts occurred, and to remedy the harm caused by such acts, and deliberate indifference by policymaking officials at the Queens DA office in its obligation to properly train, instruct, supervise and discipline its employees, including the ADAs involved in the prosecution of the plaintiff's case, with respect to such matters.

77. Upon information and belief, the Queens District Attorney and its ADAs have a policy, express or implied, to permit and encourage its ADA's to withhold exculpatory evidence from defendants and its counsel, to cover up the withholding of exculpatory evidence, to orchestrate cover ups, to devise false versions of events, and that this policy has been indoctrinated into the Queens District Attorney's Office so that ADAs in the course of their duty are more likely to withhold exculpatory evidence during the course of a trial.

78. Upon information and belief, the Queens District Attorney and its ADAs has furthered and implemented this policy, by maintaining a system of review of its ADA's conduct which is so untimely and cursory as to be ineffective, and which permits and tolerates the

withholding of Brady Material, and violations of the Constitution and deprivations of liberty without due process of law.

79. At all times pertinent hereto, the ADAs prosecuting the plaintiff herein were acting within the scope of their employment and pursuant to the aforementioned policies and practices of the Queens District Attorney's office. These policies and practices which were enforced by the Queens District Attorney's office were the moving force, proximate cause, and/or the affirmative link behind the conduct causing the withholding of Brady material, thereby resulting in the plaintiff's five years of incarceration and his resultant injuries.

80. The City of New York is therefore liable for the violations of Plaintiff's constitutional rights by the District Attorney of Queens County, personally and through his authorized ADAs.

81. By virtue of the foregoing, Defendant City of New York is liable for having substantially caused the foregoing violations of the plaintiff's constitutional rights and his personal injuries.

82. That by virtue of the foregoing, Plaintiff has been damaged in the amount of TEN MILLION [$10,000,000.00] DOLLARS.

**AS AND FOR A THIRD CAUSE OF ACTION FOR A MONELL CLAIM AGAINST DEFENDANT CITY OF NEW YORK, PLAINTIFF RESTATES AND REALLEGES EVERY ALLEGATION SET FORTH IN PARAGRAPHS MARKED AND ENUMERATED "1-66" AND FURTHER ALLEGES AS FOLLOWS:**

83. Upon information and belief, acting individuals on behalf of the New York City Police Department withheld favorable material evidence from the plaintiff and his attorney, presented false and misleading testimony and argument against the plaintiff at his trial, failed to correct such testimony and argument, acted to conceal the aforementioned wrongdoing from the

plaintiff and his attorney, and perpetuated and ratified such misconduct during the trial of the plaintiff.

84. The aforesaid conduct operated to deprive plaintiff of his rights under the Federal and State Constitution and the laws of the United States and New York State.

85. The New York City Police Department failed to timely disclose for use at trial all material evidence favorable to his defense, pursuant to Brady v. Maryland, 373 U.S., 83 (1963); the New York City Police Department used false or misleading testimony or argument knowingly and/or recklessly presented by Police Officers in violation of the Fourth, Fifth, Eighth and Fourteenth Amendments and the Police Department violated the Plaintiff's right to be free from an illegal search and seizure by arresting him with evidence that was exculpatory to him; as a result of the arrest, plaintiff's parole and/or probation was violated, and he was a State Prisoner who had to serve out his time for the violation, and the presentation of false evidence and/or failure to provide exculpatory evidence for four years after his arrest.

86. The foregoing violated the plaintiff's constitutional rights by actions taken under color of State Law.

87. The foregoing violations of the plaintiff's constitutional rights were directly, proximately and substantially caused by conduct, chargeable to the City of New York, including the institution and implementation of unlawful policies, procedures, regulations, practices and/or customs concerning the continuing obligation to make timely disclosure to the defense, before and during the trial of material evidence favorable to the defense; the duty not to present at trial false, misleading improper or unreliable evidence, testimony, statements or argument; the continuing obligation to correct false inaccuracies, incomplete or misleading evidence, testimony, statements or argument, whenever such acts occurred, and to remedy the harm caused

by such acts, and deliberate indifference by policymaking officials at the Police Department in its obligation to properly train, instruct, supervise and discipline its employees, including the officers involved in the prosecution of the plaintiff's case, with respect to such matters.

88. Upon information and belief, the New York City Police Department has a policy, express or implied, to permit and encourage its employees to withhold exculpatory evidence from defendants and its counsel, to cover up the withholding of exculpatory evidence, to orchestrate cover ups, to devise false versions of events, and that this policy has been indoctrinated into the New York Police Department so that Officers in the course of their duty are more likely to withhold exculpatory evidence during the course of a trial.

89. Upon information and belief, the New York City Police Department has furthered and implemented this policy, by maintaining a system of review of its officers' conduct which is so untimely and cursory as to be ineffective, and which permits and tolerates the withholding of Brady Material, and violations of the Constitution and deprivations of liberty without due process of law.

90. Prior to plaintiff's arrest, policymaking officials at the NYPD with deliberate indifferent to the constitutional rights of the individuals suspected of criminal activity and to the risk of arresting, prosecuting and convicting innocent people, elected not to provide police officers and detectives with minimally adequate training and elected not to adopt minimally adequate policies, procedures, or standards, concerning the police use of comparing ballistic and forensic evidence with other open or closed cases.

91. In addition, NYPD policymaking officials instituted and implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision and discipline concerning the continuing duty of police investigators to preserve and to make timely

disclosure to the District Attorney, during the criminal investigations and prosecutions, of all material evidence or information, including Brady material, favorable to a person, suspected, accused, indicted or convicted of criminal conduct, including but not limited to, evidence of innocence, forensic and ballistic evidence of innocence, or evidence which was exculpatory or evidence tending to show innocence, so that the District Attorney could comply with his constitutional right and obligation to disclose such information under Brady.

92. The aforesaid deliberate or de factor policies, practices and/or customs were implemented and/or tolerated by policymaking official for the Defendant City of New York, so that the NYPD was not properly trained to be able to make the types of decisions in the investigation and prosecution of a crime, necessary to avoid the deprivation of the constitutional rights of criminal suspects or defendants and avoid causing them constitutional injury.

93. The City of New York was aware of this policy based upon judicial decisions, criticizing NYPD officers, numerous credible allegations, some substantiated by judicial decision, that the NYPD had wrongfully withheld, lost or failed to disclose evidence favoring a criminal defendant that they had been required to make in a timely manner to the prosecution, or the defense under Rosario and Brady, numerous civil lawsuits some of which resulted in settlements, alleging that police falsified, exaggerated, or withheld evidence, thereby improperly causing injury to individuals suspected of a crime, decisions in all court discussing the difficult issues that arise under the Brady rule; judicial decisions criticizing the NYPD for failing to train and supervise officers in their Brady obligations and for failing to adopt adequate Brady Disclosure policies  Walker v. City of New York, 974 F.2d 293 (2nd Cir. 1992), and the inherent need to train supervise and discipline police officers in such obligations to counteract the

pressure on officers to close case and to obtain convictions and the incentives they have to ignore.

94. At all times pertinent hereto, the officers prosecuting the plaintiff herein were acting within the scope of their employment and pursuant to the aforementioned policies and practices of the New York City Police Department. These policies and practices which were enforced by the New York City Police Department were the moving force, proximate cause, and/or the affirmative link behind the conduct causing the withholding of Brady material, thereby resulting in the plaintiff's five years of incarceration and his resultant injuries.

95. The City of New York is therefore liable for the violations of Plaintiff's constitutional rights by the New York City Police Department.

96. By virtue of the foregoing, Defendant City of New York is liable for having substantially caused the foregoing violations of the plaintiff's constitutional rights and his personal injuries.

97. That by virtue of the foregoing, Plaintiff has been damaged in the amount of TEN MILLION [$10,000,000.00] DOLLARS.

**WHEREFORE,** Plaintiff demands Judgment as follows:

I. Judgment on the First Cause of Action against the City of New York in an amount which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction;

II. Judgment on the Second Cause of Action against the City of New York in the amount of TEN MILLION ($10,000,000.00) DOLLARS;

III. Judgment on the Third Cause of Action against the City of New York in the amount of TEN MILLION ($10,000,000.00) DOLLARS;

IV. Together with the costs and disbursements of this action, for reasonable attorney's fees under the applicable Federal Statutes, and for such other and further relief as to this Court seems just and proper.

DATED:     September 21, 2019
           Flushing, New York

_____
ANDREW F. PLASSE, Esq.
BY: ANDREW F. PLASSE
Bar Roll No.: AP-3679
Attorney for the Plaintiff
Office and P.O. Address
163-07 Depot Road, Suite 205
Flushing, NY 11358
[212] 695-5811


**DEMAND FOR JURY TRIAL IS HEREBY MADE PURSUANT TO RULE 38 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

_____
ANDREW F. PLASSE, Esq.
BY: ANDREW F. PLASSE
Bar Roll No.: AP-3679
Attorney for the Plaintiff
Office and P.O. Address
163-07 Depot Road, Suite 205
Flushing, NY 11358
[212] 695-5811